IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 12, 2011

STATE OF TENNESSEE v. MATTHEW PERRY

Direct Appeal from the Criminal Court for Shelby County
No. 08-02978    Paula Skahan, Judge

No. W2010-00951-CCA-R3-CD  - Filed September 8, 2011

A Shelby County jury convicted the Defendant, Matthew Perry, of first degree felony murder and attempted aggravated robbery, and the trial court sentenced the Defendant to serve an effective sentence of life in the Tennessee Department of Correction. On appeal, the Defendant contends that the trial court erred when it: (1) denied a pretrial motion to suppress his admissions to police; (2) improperly allowed certain photographs of the victim into evidence at trial; and (3) allowed irrelevant testimony. Finally, the Defendant asserts that the evidence is insufficient to support his convictions. After a thorough review of the record and the applicable law, we affirm the trial court's judgments.

Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Mark Mesler, Memphis, Tennessee, for the Appellant, Matthew Perry.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; Jennifer Nichols, Assistant District Attorney General, for the Appellee, State of Tennessee.

OPINION
I. Facts

This case arises from the shooting death of Asa McGhee at his home on October 3, 2007. Based on these events, a Shelby County grand jury indicted the Defendant for first degree felony murder, the murder occurring during the perpetration of attempted robbery, and

attempted aggravated robbery.

## A. Suppression Hearing

On December 12, 2008, the trial court held a suppression hearing to address whether the Defendant's admissions to police officers were illegally obtained. The following evidence was presented at the hearing: Sergeant Ragland,[1] a Memphis Police Department officer, testified that, at the time of the shooting, the Defendant was seventeen years old but turned eighteen a week before his arrest for these charges. After he was developed as a suspect, Sergeant Ragland obtained an attachment from the juvenile court for the Defendant. Ultimately, the Defendant was located on October 23, 2007, in Brownsville, Tennessee, and he was transported to Memphis on October 24, 2007.

Sergeant Ragland recalled that October 24 was his day off, but when he learned that the Defendant had been apprehended and transported to Memphis, he went to the office. According to police records, the Defendant was placed in an interview room at 12:37 p.m. Sergeant Ragland advised the Defendant, both orally and in writing, of his *Miranda* rights, and the Defendant waived those rights and agreed to speak with the police officers at 1:32 p.m. Sergeant Ragland recalled that the Defendant had obtained his GED (general educational development) diploma and appeared to understand the rights that were explained to him. The Defendant's formal statement was not taken until 6:13 p.m. that evening and was completed at 7:18 p.m. Sergeant Ragland explained that the delay was due to the fact that, during the initial interview, the Defendant denied involvement. The Defendant later admitted involvement, but he never admitted being the shooter. Because the Defendant indicated another person was involved, police officers spent a "great deal" of time trying to identify the other person in their database so the Defendant could identify him. The Defendant referred to the person as "Big P," but the police were unable to establish a real name for "Big P" and thereby confirm the Defendant's account of a second person's involvement. The Defendant's "final story" regarding "Big P" was that he "just kind of knew this guy" but did not know where he lived. The Defendant told police officers that he met "Big P" prior to the homicide at a Burger King near the intersection of Hollywood and Interstate 240. The Defendant also said that he knew that "Big P" sometimes "h[u]ng[] out" at a carwash on Hollywood.

Sergeant Ragland said that the Defendant was in the interview room from 12:37 p.m. until the statement was completed almost seven hours later. He said that the Defendant was allowed to use the restroom during that time and was offered food and water. Sergeant Ragland denied that anyone threatened the Defendant or that any promises were made to the Defendant in exchange for his statement. Sergeant Ragland said that the Defendant was

---

[1]This witness is referenced as Sergeant Ragland, with no first name provided, in the record.

relatively cooperative except that he would not provide further information about "Big P." Sergeant Ragland said it "was really frustrating" because it seemed as though the Defendant did not grasp the gravity of the charges against him.

Sergeant Ragland testified that, after the juvenile hearing where the Defendant's cases were transferred to criminal court, police officers again met with the Defendant to ask about "Big P's" role and whether the Defendant wanted to provide more information. The Defendant refused to give any further information and was only interested in discussing why police had not recovered his car.

On cross-examination, Sergeant Ragland testified that the Defendant was shackled to a chair in the interview room and that four different officers spoke with the Defendant during the six-hour period. None of the conversations with the Defendant during this time were recorded. Sergeant Ragland agreed that he told the Defendant that his cooperation would help. He explained this statement to the Defendant by saying, "It's been my experience that the Court is more lenient with those who are cooperative with the Court, and by that I mean people are remorseful and tell the facts the way they are and show - - remorse is a big thing." Sergeant Ragland agreed that the Defendant was crying during portions of his statement. Sergeant Ragland recalled telling the Defendant that he was potentially facing life in prison, but he denied telling the Defendant he could avoid a life sentence if he cooperated. Sergeant Ragland said that he told the Defendant the following:

> [Y]ou're involved in something serious, and that's what you need to grasp, . . . and so if you want a portion of your life back, then you need to make this right, and the way to make this right is to confess, put this behind you, move forward so you can tell the Court, tell the judge, whoever, I did it. I'm sorry. It was wrong. I have learned something as opposed to I don't know what you're talking about."

Sergeant Ragland testified that he was aware that the District Attorney General's Office had a "no deals" policy for first degree murder cases but that he did not inform the Defendant of this policy. Sergeant Ragland explained that he did not inform the Defendant of this policy because, in his experience, even though a defendant may be charged with first degree murder he may not necessarily be convicted of that crime.

The Defendant testified that he had never been arrested before and could read and write "very well." The Defendant said that he understood when Sergeant Ragland told him he was facing life in prison for the victim's death. The Defendant agreed that he gave police a statement and explained that he did so because he was told that, if he cooperated, he could "possibl[y]" get less time than a life sentence. The Defendant said that he was never told that the District Attorney General had a policy not to reduce first degree murder charges. The Defendant recalled meeting with the police officers a second time and said that he was never

advised of his *Miranda* rights and that he told the police officers that he did not want to speak with them without his attorney present.

On cross-examination, the Defendant agreed that police officers reviewed his rights with him and that he understood his rights and chose to speak with the police officers.

Based upon this evidence, the trial court denied the Defendant's motion to suppress.

## B. Trial

At the Defendant's trial, the parties presented the following evidence: Paris Humes, the victim's girlfriend and mother of his child, testified that she worked as a medical clerical assistant. She often left their baby with the victim while she was at work. At around 8:00 a.m. on the morning of October 3, 2007, Humes called the victim, who sounded as if she woke him, and arranged to drop off their two-month old son with the victim while she attended a physical examination required for a new job. Humes arrived at the victim's home at approximately 9:30 a.m. and parked her car under the carport. She noticed that the victim's car was parked in the street with a car door and the trunk open.

Humes said that she proceeded to take her baby out of the car and that, while doing so, a man she had never seen before exited the house through the carport door. Humes described the man, who we will refer to as "Big P,"[2] as approximately six-feet tall, with brown skin, a "low haircut," and a tattoo on his lower right arm. He was wearing a white short-sleeved t-shirt, jeans, and white gloves with a blue stripe down the sides. Humes and "Big P" stared at one another as he walked past Humes. Humes picked up her son and walked into the victim's home through the carport door. As she entered, she noticed that the wood along the side of the carport door was cracked. Humes said that, upon entering the house, she did not see anyone else and began walking toward the victim's bedroom when "Big P" re-entered the house and asked Humes if she was the victim's girlfriend. Humes confirmed she was the victim's girlfriend and then asked where the victim was, but "Big P" did not respond. Humes continued toward the victim's bedroom and heard voices, one of which she recognized as the victim's voice. When she entered the bedroom, she saw a man she recognized as "ATL," whom she later identified as the Defendant, wearing a white t-shirt and kneeling between the far side of the bed and the wall, over the victim, who was on the floor.

Humes explained that she recognized the Defendant as "ATL" because the Defendant's phone number was programmed into the victim's cellular telephone as "ATL," and she had

---

[2]In later testimony it became clear that police officers thought this man was the man the Defendant referred to as "Big P." Although police officers were never able to confirm this information or find a person named "Big P," for the clarity of these facts, we will refer to the second person involved in these crimes as "Big P."

seen this name appear on the victim's phone screen numerous times. After seeing his name appear on her boyfriend's phone several times, Humes met the Defendant one night when she and her boyfriend ate at Picadilly, where the Defendant worked. As Humes and the victim left the restaurant, the victim introduced Humes to the Defendant and told her that the Defendant wanted to buy the victim's watch. Humes described the victim's watch as black with diamonds circling the face of the watch. Humes recalled that before the shooting she saw the Defendant on one other occasion at the victim's house.

When Humes entered the victim's bedroom, the Defendant turned and looked directly at Humes. Humes recalled that she could hear the victim's voice coming from the floor on the far side of his bed but that she could not see him. "Big P" entered the room, and Humes asked him "what was going on," and he responded, "[Y]ou know what this is." Humes heard the victim telling the Defendant, "[M]an, I ain't got nothing." It was then that Humes saw that "Big P" was holding a gun and that she began screaming, "[P]lease don't kill him!" "Big P" told Humes to be quiet and that he was not going to kill the victim, and he forced Humes and her baby into a bathroom connected to the bedroom and closed the door. Humes could no longer see the men but heard the Defendant telling the victim, "Man, I got your baby in here, and your girl here now, you going to give me the money or what." The victim maintained that he did not have any money. Meanwhile, Humes screamed, and "Big P" beat on the bathroom door and instructed her to "shut up."

The argument between the Defendant and the victim continued with the victim's urging the Defendant to check his car to confirm that the victim did not have any money. The Defendant told the victim that they had already checked his car and that they found no money. Humes then heard the Defendant say, "[M]an, give me the gun," and immediately thereafter three or four gunshots rang out. Humes recalled that she heard the victim groan after every gunshot except the last. "Big P" hit the bathroom door again and said, "[B]aby girl, stay in there, don't come out," and the men left. When Humes heard the sound of a car leaving, she came out and checked on the victim. She described him as lying on the floor with his eyes rolled back. She looked at the victim's body underneath the blanket he was wrapped in and saw gunshot wounds. Humes heard someone bang on the window and, when she looked up, she saw a man who asked if she was okay. He told Humes he had called the police, but, by this time, Humes was already on the line with an emergency operator who instructed her to raise the victim's legs, which she did. Humes watched as the victim's breathing began to slow and then stopped. Emergency personnel arrived and Humes told police officers that "ATL" had shot the victim.

Humes testified that she went to the police station and gave a statement about the shooting. She was also shown a photographic line-up, and she identified the Defendant as "ATL," the man who had shot the victim.

On cross-examination, Humes agreed that, although she heard the Defendant ask for

the gun and then heard gunshots, she did not see "Big P" hand the Defendant the gun because she was behind a closed door in the bathroom.

Ponsay Bratcher testified that he lived in the same neighborhood as the victim and owned a lawn care service. Bratcher said that he provided lawn service for several yards in the neighborhood and that, on the morning of October 3, 2007, he was going to work on a yard on Cordell Street near the victim's home. When Bratcher arrived at this location he found a purple car, which he thought was a Ford Taurus or Chevrolet Cavalier, parked at an odd angle in front of the house. Bratcher explained that this struck him as odd because of the positioning of the car, as well as the fact that this home was unoccupied and owned by a realty company. Bratcher recalled having seen this purple car before at the victim's house. Because the car was partially in the yard, Bratcher decided he would mow this lawn later. Bratcher then drove on to Churchill Street where he maintained two yards located across the street from the victim's home. Bratcher said that, as usual, he parked in front of the victim's house because he believed no one would be home at that time of day. As he approached the house, Bratcher noticed a man run out to the victim's car that was parked on the street, open a door, and look around inside the car. When the man saw Bratcher, he pulled his black t-shirt up over his face exposing a white t-shirt underneath and ran back to the carport where he grabbed another man who was looking into a Corolla. The two men, both covering their faces with their shirts, ran to the victim's car and drove away. Bratcher described the two men as being of "slim build" with "clean haircut[s]" and said both men were wearing gloves.

When the two men drove off in the victim's car, Bratcher believed the men were stealing the car so he followed them a short distance so he could tell the victim which direction the men went. Bratcher then returned to the victim's home, and when he got out of his truck, he heard someone in the victim's house screaming. Bratcher ran up to the window of the victim's home and knocked on the window. Bratcher recalled that both the front door and the carport door were open. The woman inside was screaming "[H]elp, help, help, they shot him!," so Bratcher called 9-1-1.

Bratcher testified that he remained outside the victim's home until police arrived and that he gave a statement to police. After doing so, Bratcher went to put some of his lawn equipment away, which required him to pass by the house on Cordell Street where the purple car had been parked earlier that morning. This time, however, the purple car was gone. Instead, the victim's car, with the doors and trunk open, was parked in the street one house down from where the purple car had previously been parked.

Bratcher testified that he was shown a photographic line-up and that he was unable to make a positive identification of either of the two men he had seen take the victim's car.

On cross-examination, Bratcher agreed that, although he could not identify the two men in a photographic line-up, he did tell the 9-1-1 operator that he had seen both men before.

He also gave a specific description of what the two men were wearing. He said that both men were wearing black T-shirts, but that one man had a white T-shirt underneath his black shirt, and the other man had a blue t-shirt underneath his black shirt. Bratcher testified that one of the men was carrying something black but Bratcher could not identify the item and that he did not see whether either man had a weapon.

Cottrell Armstrong testified that he was the victim's step-father and had known the victim since he was ten or eleven years old. Armstrong said that, at the time of the victim's death, the victim was living with Armstrong and the victim's mother in their house on 2840 Churchill Street. Armstrong described his house as having two entries, the front door that faced the street and a door in the carport. Armstrong said that, upon his departure from his home that morning to go to work, he exited the home through the carport door and did not notice any damage to this door. After his wife summoned him home due to these events, he noticed damage to the door in the carport that "appeared to be an attempt to push the door in."

Corey Armstrong testified that he had daily contact with the victim and was familiar with the victim's personal possessions. On the day of the victim's death, Corey[3] was asked to clean up the victim's room after emergency personnel left. After straightening and cleaning the victim's room, Corey was unable to find the victim's wallet, one of the victim's princess-cut diamond earrings, and the victim's black watch with diamonds circling the face of the watch.

Dr. Miguel Laboy, an assistant medical examiner, testified that he performed the victim's autopsy. Dr. Laboy reported that he found three gunshot wounds to the body: one in the chest, one in the abdomen, and one in the head. Dr. Laboy testified that the bullet that caused the head wound entered the back of the victim's head and was fired from a gun located at an indeterminate range. Dr. Laboy testified that this gunshot wound was fatal and that, after receiving this head wound, the victim would have been unable to make any major movement.

Dr. Laboy testified that a "contact range" gunshot wound was present on the victim's chest and that the bullet that caused this wound perforated the victim's left lung, fractured his ribs, and exited through his back. Dr. Laboy testified that, without proper medical attention, this wound could have been fatal as well. As to the gunshot wound to the victim's abdomen, Dr. Laboy testified that it was a contact range wound that penetrated the abdominal cavity causing significant internal damage. Due to this damage, Dr. Laboy testified that the victim would have required "rapid medical care, and some proper medical surgical intervention" in order to survive.

---

[3] Because there are two witnesses who share the last name Armstrong, we reference Corey Armstrong by his first name. By referring to him by his first name we mean no disrespect to this witness.

When asked if it would have been possible for Humes to hear the victim groan after the first and second gunshot wound, Dr. Laboy responded that it would be unlikely for someone to make multiple sounds after getting shot in the head. He qualified this by stating that he did not know specifically what type of sound Humes heard, but he believed it unlikely that the victim could talk or moan after the gunshot wound to the head. A toxicology analysis indicated traces of alcohol in the victim's blood. Dr. Laboy testified that the cause of death in this case was multiple gunshot wounds and the manner of death was homicide. On cross-examination Dr. Laboy agreed that he could not determine the order in which the gunshot wounds occurred.

Ricky Davison, a Memphis Police Department officer, testified that he reported to this crime scene to collect and document the evidence through photographs and sketches. Officer Davison identified photographs taken at the scene. Officer Davison testified that he collected the comforter that had been used to wrap the victim. He recalled that the comforter bore what appeared to be blood and two bullet holes. A nine-millimeter live round, a forty-caliber live round, three forty-caliber casings, and a bullet fragment were all recovered from the victim's bedroom. Officer Davison testified that no fingerprints of value were recovered from the scene.

Jason Singleton, a Brownsville police officer, testified that, in October 2007, he received a request from the Memphis Police Department for assistance in locating the Defendant. On October 27, 2007, Lieutenant Singleton went to the Defendant's grandmother's residence, and the Defendant's grandmother indicated that the Defendant had left two or three hours before. The Defendant's grandmother consented to a search of the residence and provided officers with the name Felicia Mann, who she said was the Defendant's friend. She believed the Defendant might be with this person. Lieutenant Singleton said he was familiar with Mann and went to her address. Mann told officers that the Defendant had slept in her home the night before but that he had just left. Mann consented to a search of the room in which the Defendant stayed the previous night. After officers found a forty-caliber handgun on the dresser, Mann denied ownership of the handgun. Mann offered to make contact with the Defendant by phone and arrange a meeting with the Defendant. Mann arranged a meeting, and police officers then followed Mann to the meeting location and placed the Defendant under arrest.

The State submitted a stipulation by the parties, which stated that Cervinia D. Braswell, a forensic scientist with the Tennessee Bureau of Investigation, examined the forty-caliber pistol confiscated from the room in which the Defendant spent the night at Mann's home and the bullet casings and fragments found at the scene of the crime and determined that the bullet casings were not fired from the pistol.

Lieutenant Ronald Collins, a Memphis Police Department officer, testified that he interviewed the Defendant on October 24, 2007. Lieutenant Collins said that, before the

interview, the Defendant was advised of his *Miranda* rights, and the Defendant agreed to speak with the police officers about the shooting of the victim. When the Defendant was asked if he was responsible for the homicide, he replied, "If it wasn't for me, it would have never happened." The Defendant told the police officers that "Big P" was with him and he described "Big P" as having a "brown complexion, short hair, bulgy eyes, kind of fat nose. Probably about five nine, six foot. Kind of heavy set. Stocky. In his twenties." The Defendant said the weapon used in this homicide was a black or silver automatic handgun that "Big P" kept in his pants. The Defendant said that he bought weed from the victim and knew him as "Ace" or "Little Ace." The Defendant then provided the following description of the events leading to the shooting of the victim:

> Big P called and asked me if I knew where any good green was, and I told him my guy got it. We got together and we was fixing to go. On the way there, he kept asking, what he got. What kind of work he working with. We pull up to the house and park on the side of the road behind his car. I got out of the car. I walked up and knocked on the door and ring the doorbell. Big P got out the car with the gun and was like, man, come on, I know he got something in there. I go back over there and I ring the side doorbell. When I walk back to the other side Big P was bum rushing through the door. He was walking through the house and he saw [the victim] and he fired a shot. I went on to the side of the bed with [the victim] and was talking to him. For a span of at least twenty to thirty minutes I was on the side of the bed with [the victim]. Then Big P walked in and said Ace's momma was outside. Big P walked out of the room and came back with a pistol to a girl that wasn't [the victim's] momma. It was [Humes], [the victim's] baby's momma she had his baby with her. I'm telling the dude to give me a gun because she didn't have nothing to do with it, but he didn't give it to me, so I just told [Humes] and the baby to go in the bathroom. Like ten minutes later, Big P came back and was like, come on, let's go. I was still on the side of the bed with [the victim]. After awhile, Big P told me to go. I started to leave, I heard one more gunshot, so I walked back in there with [the victim]. He was fixing to die, and then I seen Big P pull off in the car, so I ran out of the house and ran around the corner and tried to follow him. I got around the corner and the car doors was open and the trunk was open. Big P was in the car talking about we was fixing to go and let's go, and I got in the car with him. On the way to the house I was just asking him what happened. He said he got bad and he didn't get nothing. We got back to the Burger King. I got out of the car and he yanked out in my car. I left and went out of town to Brownsville. I don't even know where my car at. On the [way] back [ ] to the Burger King, Big P told me not to say his name or he knew where my girlfriend and everybody stay at. He said don't put my name in nothing. I didn't even get nothing. I told him all right. I don't know nothing.

The Defendant said that, at the time of the shooting, he was wearing jeans and a white T-shirt. He described "Big P" as wearing shorts and a black T-shirt. The Defendant denied that either of them were wearing gloves. The Defendant told police that, "to [his] knowledge," nothing was taken from the victim.

Based upon this evidence, the jury convicted the Defendant of first degree felony murder in the perpetration of an attempted robbery and attempted aggravated robbery. The trial court ordered the Defendant to serve an effective sentence of life in the Tennessee Department of Correction. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant asserts that the trial court erred when it: (1) denied his pretrial motion to suppress his admissions to police; (2) improperly allowed the introduction of certain photographs of the victim into evidence at trial; and (3) allowed irrelevant testimony. Finally, the Defendant asserts that the evidence is insufficient to support his convictions.

We note that, in the table of contents section of the Defendant's brief, an additional argument related to the medical examiner's testimony is listed. Beyond this listing in the table of contents there is no further mention of this issue in the Defendant's brief. The State also makes no mention of this issue in its brief. Thus, because there is no argument or citation to law we treat this issue as waived pursuant to Rule 10 (b) of the Rules of the Court of Criminal Appeals of Tennessee.

## A. Motion to Suppress

The Defendant contends that the trial court erred in denying his motion to suppress his statement to police because the Defendant's statement "was absolutely obtained by 'direct or implied promises' that a confession would result in a lesser charge." The Defendant asserts in his brief that detectives used the Defendant's "youth, his emotional state of mind and the promise of a lesser charge to coerce a confession out of him." In the argument portion of his brief, however, he only addresses the detectives' alleged promise of a lesser charge. The State responds that the record supports the trial court's finding that the Defendant was not coerced into giving a statement.

After hearing testimony from Sergeant Ragland and the Defendant at the suppression hearing, the trial court made the following findings:

> [T]his Court finds the statements made by Defendant during the interrogation on October 24, 2007 to be admissible at trial. Considering the

totality of the circumstances and additional factors, Defendant's statements were given knowingly and voluntarily. First, Defendant signed an advice of rights form that explained his Miranda rights. The form also questioned whether Defendant understood the rights explained to him and whether in light of those rights, he wished to continue to speak with law enforcement. Defendant answered both questions in the affirmative. The advice of rights form is evidence of sufficient Miranda warnings. Moreover, after the advisement of rights form was signed, Defendant did not request an attorney at the interview and thus, did not invoke his right to counsel.

Next, the length of the interview was appropriate and did not overbear Defendant's will such that his statements could be considered involuntary. Tennessee courts have held, after an evaluation of all the circumstances, that statements made during an interrogation lasting for eight hours were voluntary. In th[is] case, the entire interrogation was discontinuous and lasted slightly over six hours. Defendant was also provided food, sleep,[4] and the use of restroom facilities as necessary. Thus, the length of the interrogation, when considered under the totality of the circumstances, did not overbear the will of Defendant and his statement was made voluntarily.

Additionally Defendant's statement may be considered voluntary because there is insufficient evidence to support the claim that his statement was induced by the promise of a lesser sentence. . . . [T]here is conflicting testimony as to what was specifically said or promised to Defendant. The conflicting testimony provides insufficient evidence to show that Defendant was improperly influenced with the promise of a lower sentence in exchange for his confession during interrogation. Moreover, there is insufficient evidence to support the proposition that Defendant was compelled to confess by the promise of leniency.

(citations omitted).

The standard of review for a trial court's findings of fact and conclusions of law in a suppression hearing was established in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). This standard mandates that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23; *see State v. Randolph*, 74 S.W.3d 330, 333 (Tenn. 2002). The prevailing party in the trial court is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable

---

[4] The trial court lists "sleep," however, our review of the record reveals that officers testified only as to food, water, and restroom facilities. We view this as a minor oversight which does not affect the outcome of this case.

and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23. Furthermore, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id*. However, this Court reviews the trial court's application of the law to the facts *de novo*, without any deference to the determinations of the trial court. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). The defendant bears the burden of demonstrating that the evidence preponderates against the trial court's findings. *Odom*, 928 S.W.2d at 22-23; *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding that the Fifth Amendment's protection against compulsory self-incrimination is applicable to the states through the Fourteenth Amendment). Article I, Section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The significant difference between these two provisions is that the test of voluntariness for confessions under Article I, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992).

Generally, one must affirmatively invoke these constitutional protections. An exception arises, however, when a government agent makes a custodial interrogation. Statements made during the course of a custodial police interrogation are inadmissible at trial unless the state establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 471-75 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 478; *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). In this case, the Defendant does not dispute that he made a voluntary, knowing, and intelligent wavier of his rights to counsel and against self-incrimination during the interviews with Sergeant Ragland and Lieutenant Collins. Instead, the Defendant argues that the statements he made during his custodial interrogations were involuntary because they were the product of coercion.

"Confessions that are involuntary, i.e., the product of coercion, whether it be physical or psychological, are not admissible." *State v. Phillips*, 30 S.W.3d 372, 376 (Tenn. Crim App.2000) (citing *Rogers v. Richmond*, 365 U.S. 534, 540 (1961)). In order to make the determination of whether a confession was voluntary, the particular circumstances of each case must be examined. *Id*. at 377 (citing *Monts v. State*, 218 Tenn. 31, 400 S.W.2d 722, 733 (1966)). "Coercive police activity is a necessary prerequisite in order to find a confession involuntary." *Id*. (citing *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)). "The crucial

question is whether the behavior of the state's officials was 'such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.'" *Id*. (quoting *Rogers*, 365 U.S. at 544 ); *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980). The question must be answered with "complete disregard" of whether the defendant was truthful in the statement. *Phillips*, 30 S.W.3d at 377 (citing *Rogers*, 365 U.S. at 544).

After thoroughly reviewing the testimony at the suppression hearing, we conclude that the evidence does not preponderate against the trial court's findings that the Defendant voluntarily made his statement to the officers.

The Defendant relies heavily upon his alleged complaint that his confession was coerced because police officers "promised" him a lesser sentence if he were to cooperate and provide them a statement. Sergeant Ragland acknowledged that he told the Defendant he could receive a life sentence for a murder conviction, but he denied promising the Defendant he would not receive a life sentence if he cooperated with detectives. The trial court found that the testimony of Detective Ragland was credible and therefore denied the Defendant's motion to suppress. Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. *Odom*, 928 S.W.2d at 23.

As to the issues of the Defendant's youth and "emotional state" contributing to a coerced confession, we conclude that the facts presented at the suppression hearing weigh in favor of the trial court's finding. The Defendant was eighteen years old at the time of the interview, he had completed his GED, and he could read and write "very well." Both Sergeant Ragland and Lieutenant Collins testified that, after being arrested, the Defendant signed the Miranda rights form, and said that he did not want an attorney. The Defendant also testified that he understood his rights and waived them. Although the Defendant cried at times while giving his statement, no other evidence in the record shows that he was in an "emotional state of mind." And, although the Defendant was kept in an interrogation room for slightly more than six hours, the interrogation was not continuous due to police attempts to confirm the Defendant's story about "Big P." During this time, the Defendant was offered food, water, and access to the restroom.

The Advice of Rights forms signed by the Defendant, the officers' testimony, and the Defendant's testimony regarding his understanding and waiver of his rights, support the trial court's finding that the confession was not the product of coercion. Accordingly, after thoroughly reviewing the evidence from the suppression hearing, we conclude that the evidence does not preponderate against the trial court's findings that the Defendant voluntarily made the statements to the agents. The Defendant is not entitled to relief as to this issue.

**B. Introduction of Photographs**

The Defendant next asserts that the trial court improperly admitted certain photographs into evidence. He objects to the admission of the following photographs: (1) a photograph of the victim with his children; and (2) the duplicative photographs of the victim's head injuries. The State responds that, because the trial court looked at every disputed photograph and ruled that the photographs were relevant and that their probative value substantially outweighed any prejudicial effect, the photographs were properly admitted into evidence.

Under Rule 401, "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Rule 402 states, "All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. Finally, Rule 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. "The decision regarding the admissibility of photographs pursuant to these Rules lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing of an abuse of that discretion." *State v. Young*, 196 S.W.3d 85, 105 (Tenn. 2006) (citing *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978)).

### 1. Photograph of the Victim with his Children

The Defendant argues that the trial court erred when it entered a photograph of the Defendant with his two children because it was not relevant and was unfairly prejudicial. The State responds that this picture also included the Defendant's watch, which was referenced in Humes's testimony and was relevant to establish the Defendant's identity and motive for robbing the victim.

The photograph at issue is a photograph of the victim sitting in a chair holding his baby while gesturing playfully at another young child. A black watch with diamonds circling the face of the watch sits in the cup holder of the chair in which the victim sits. At trial, defense counsel objected to the photograph on the basis that its probative value was outweighed by the danger of unfair prejudice, pointing out that Humes had not mentioned the Defendant's interest in buying the victim's watch in any of her three prior statements to police. The State responded that this photograph was relevant as to the Defendant's identity as one of the two men responsible for the victim's murder and that it was the only picture the State possessed of the watch at issue. The trial court overruled the Defendant's objection and found that the photograph was relevant and that the probative value was not outweighed by the danger of unfair prejudice. When denying the Defendant's motion for new trial based upon this issue, the trial court stated that the photograph was relevant to show the Defendant's motive for

robbing the victim. The trial court stated, "I thought it certainly was relevant to show the jury the motive that [the Defendant] had for thinking that the victim had apparently a lot of money and items of worth."

Upon our review of the record, we conclude that the trial court did not abuse its discretion by admitting this photograph into evidence. The picture was relevant to identify the Defendant as one of the two men Humes observed in the victim's house. Humes could visibly identify the Defendant as "ATL" because of her knowledge of the Defendant as the person who was interested in the victim's watch. The photograph was also relevant in demonstrating a motive for the attempted robbery alleged by the State. The probative value of this evidence is not outweighed by the prejudicial effect of the jury seeing a photograph of the victim's two small children. Through Humes's testimony, the jury was already aware that the victim had a newborn son, who was present in the house during the victim's murder, and the State informed the trial court that this was the only picture it possessed of the watch. Thus, the trial court did not err by admitting the photograph of the victim with his two children. The Defendant is not entitled to relief on this issue.

### 2. Photographs of the Gunshot Wound to the Victim's Head

The Defendant contends that the trial court erred in admitting two photographs of the same injury the victim sustained to the back of his head. The State responds that the photographs of the victim's head injuries were probative in establishing the type of injury the victim sustained and relevant to supplement the medical examiner's testimony.

The leading case regarding the admissibility of photographs of murder victims is *State v. Banks*, 564 S.W.2d 947 (Tenn. 1978), in which our Supreme Court indicated that the admissibility of photographs of murder victims is within the discretion of the trial court after it considers the relevance, probative value, and potential unfair prejudicial effect of such evidence. Generally, "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *Id*. at 950-51. However, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." *Id*. at 951. The determination of the admissibility of photographs lies within the sound discretion of the trial court, and that discretion will not be overturned on appeal absent a clear showing of abuse. *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992) (citing *State v. Allen*, 692 S.W.2d 651, 654 (Tenn. Crim. App.1985)).

Our Supreme Court provided guidance to trial courts for determining the admissibility of relevant photographic evidence and opined that a trial court should consider:

(1) the accuracy and clarity of the picture and its value as evidence; (2) whether the picture depicts the body as it was found; (3) the adequacy of

testimonial evidence in relating the facts to the jury; and (4) the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*State v. Brock*, 327 S.W.3d 645, 694 (Tenn. Crim. App. 2009) (citing, *Banks*, 564 S.W.2d at 950).

In the case under submission, the State initially sought to enter three pictures of the victim's head injuries into evidence at trial but, after the Defendant's objection, offered to enter only two of the three pictures. One of the pictures was taken at the scene of the crime and was a close-up of the back of the victim's head. The other photograph was taken of the victim's head and trunk during the autopsy, after the wounds had been cleaned. Defense counsel objected to the State's showing multiple pictures of the gunshot wound to the back of the victim's head due to the graphic nature of the photos. The State asserted that the pictures showed whether soot or stippling was present, which indicated the range from which the gun was shot. Defense counsel argued that the uncleaned wound was not probative and was prejudicial. After hearing arguments from both sides, the trial court overruled the Defendant's objection, finding that the pictures were not "so gruesome" as to "inflame the jurors." The trial court went on to say that the probative value of showing the jurors what the gunshot caused was not outweighed by the danger of unfair prejudice. Again, in denying relief as to this claim at the hearing on the motion for new trial, the trial court found that the pictures were relevant to rebut the Defendant's statement that the victim ran back to his bedroom after he was shot.

We have reviewed the photographs in question and conclude that the trial court did not abuse its discretion in admitting these two photographs into evidence. There was dispute in the proof as to the identity of the shooter and the order in which the shots were fired. The Defendant's statement to police was that "Big P" shot the victim and that then the victim ran back to his bedroom, and that then after "twenty to thirty minutes" of the Defendant talking with the victim next to his bed, "Big P" shot the victim again. Humes testified that she thought the Defendant shot the victim, who was lying on the floor next to his bed, after the victim repeatedly denied having any money. Dr. Laboy testified that the gunshot wound to the victim's head was fatal and that the victim would have been unable to speak or make any subsequent movement after sustaining this wound. The photographs were relevant evidence that supported the testimony of the medical examiner that the victim would not have been able to speak or move after sustaining the head wound. *See State v. Cole*, 155 S.W.3d 885, 913 (Tenn. 2005). We recognize that the second photograph was taken during the autopsy, after the body had been moved from the crime scene, and that this weighs against its admissibility. *See Banks*, 564 S.W.2d at 951; *State v. LeRoy Hall*, No. 03C01-9303-CR-00065, 1996 WL 740822, at *26 (Tenn. Crim. App., Knoxville, Dec. 30, 1996), *no Tenn. R. App. P. 11 application filed*. In this instance, however, the photographs were taken prior to any treatment that might have significantly altered the appearance of the injuries.

Additionally, as noted by the trial court, the photographs are not particularly gruesome. We conclude that the probative value of the photographs is not outweighed by their prejudicial effect, and the trial court did not abuse its discretion in allowing their admission. Further, it does not affirmatively appear that the "admission of the photographs has affected the results of the trial." *See Banks*, 564 S.W.2d at 953. The Defendant is not entitled to relief on this issue.

## C. Testimony of Corey Armstrong

The Defendant argues that the trial court erred by allowing Corey Armstrong, the victim's stepbrother, to testify at trial about items missing from the victim's room after the homicide. Specifically, the Defendant asserts this was error because: (1) the State did not list Corey as a potential witness and his name was not mentioned in any discovery materials, and (2) his testimony as to missing items was not relevant to the State's case because the indictment alleged an attempted robbery rather than a completed robbery. The State responds that because this evidence substantially corresponded to the charges in the indictment, the Defendant was sufficiently informed of the charges against him.

### 1. Discovery Materials

Tennessee Code Annotated section 40-17-106 directs the State to list "the names of such witnesses as [it] intends shall be summoned in the cause" on the charging indictment. *See also* Tenn. Code Ann. § 40-13-107; Tenn. R. Crim. P. 16, Advisory Comm'n Cmts. The purpose of this statute is to prevent surprise to the defendant at trial and to permit the defendant to prepare his or her defense to the State's proof. This duty is merely directory, not mandatory, however, and, therefore, the State's failure to include a witness's name on the indictment does not automatically disqualify the witness from testifying. *State v. Harris*, 839 S.W.2d 54, 69 (Tenn. 1992) ("Rule 16, Tenn. R. Crim. P., does not require nor authorize pretrial discovery of the names and addresses of the State's witnesses."). In cases of nondisclosure, a defendant must demonstrate prejudice, bad faith, or undue advantage to obtain relief. *Id*. The determination of whether to allow the witness to testify is left to the sound discretion of the trial judge, which is exercised upon examination of the circumstances presented in that particular case. *State v. Underwood*, 669 S.W.2d 700, 703 (Tenn. Crim. App. 1984) (citing *McBee v. State*, 213 Tenn. 15, 372 S.W.2d 173 (Tenn. 1963)).

At trial, the Defendant objected to the State's calling Corey Armstrong to testify because Corey Armstrong was not named in the State's witness list or in any of the discovery materials it provided to the Defendant. The State responded that the State only learned of Corey Armstrong after it furnished its witness list and the requested discovery to the Defendant. The trial court overruled the Defendant's objection but gave defense counsel the opportunity to interview Corey before he testified at trial.

In addressing this issue at the Defendant's motion for new trial, the trial court found:

> [T]he reality is one of these people came in at the last minute, you know, family members, and they give information and the State does have an obligation to provide that to you as soon as they hear about it. And I understand [ ] [i]t is tough as Defense counsel to prepare and deal with that, but in this case I did not feel that was anything done in a purposeful way. I did not feel it was unfair surprise and you certainly were given the opportunity to speak with him prior to his testimony.

The determination of whether to allow the witness to testify is left to the sound discretion of the trial judge. *Underwood*, 669 S.W.2d at 703. The trial court did not find that the omission was purposeful, and it afforded defense counsel the opportunity to interview Corey before he testified. Moreover, non-disclosures of this nature will not afford a defendant relief unless he can demonstrate that prejudice resulted from the omission, *Underwood*, 669 S.W.2d at 703, which Defendant has failed to do. The Defendant is not entitled to relief as to this issue.

## 2. Variance between Indictment and Proof at Trial

Both the Federal and Tennessee Constitutions guarantee the criminally accused knowledge of the "nature and cause of the accusation." U.S. Const. Amend. VI; *see also* Tenn. Const. art. I, § 9. In order to comply with these constitutional guidelines, an indictment or presentment must provide notice of the offense charged, adequate grounds upon which a proper judgment may be entered, and suitable protection against double jeopardy. T.C.A. § 40-13-202 (2003); *State v. Byrd*, 820 S.W.2d 739, 740-41 (Tenn. 1991).

This Court explained, "A variance between an indictment or a subsequent bill of particulars and the evidence presented at trial is not fatal unless it is both material and prejudicial." *State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000) (citing *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984)). A variance is material only where the indictment or the bill of particulars and the proof do not substantially correspond. *Id*. (citing *State v. Mays*, 854 S.W.2d 638, 640 (Tenn. 1993)). A variance is prejudicial when it causes the defendant to be misled or surprised at trial, or leaves the defendant vulnerable to a second prosecution for the same offense. *Moss*, 662 S.W.2d at 592. It is not reversible error when a defendant is sufficiently aware of the charge and is able to adequately prepare for trial. *Id*.

The indictment and the proof substantially corresponded, and the indictment provided the Defendant with sufficient notice and protection against double jeopardy. The transcript reflects that the Defendant was adequately prepared for trial, and he has failed to establish that he was prejudiced by Corey's testimony recounting items missing after the shooting. Furthermore, the State did not attempt to rely upon theories and evidence at the trial that were

not fairly embraced in the allegations made in the indictment or the bill of particulars. *Shropshire*, 45 S.W.3d at 71. The Defendant is not entitled to relief on this issue.

## D. Sufficiency of the Evidence

The Defendant contends the evidence is insufficient to support his convictions because of alleged inconsistencies in the testimony of the State's witnesses. The State responds that the jury heard and resolved any alleged inconsistencies when it convicted the Defendant on both charges.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption

of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Defendant challenges the credibility of the testimony of witnesses as the basis of his sufficiency argument. We note that it is the jury's prerogative to evaluate and weigh the evidence. Any alleged inconsistent statements and credibility issues were brought out on direct or cross-examination. The weight and credibility of the testimony of a witness and the reconciliation of conflicts in testimony, if any, are matters entrusted exclusively to the jury. By its verdict, the jury exercised its prerogative and chose to accredit the testimony of the State's witnesses. Nonetheless, we will review the Defendant's case in its entirety for the sufficiency of the evidence.

## 1. Felony Murder

In this case, the Defendant was convicted of first degree felony murder in the perpetration of an attempted robbery, which requires proof beyond a reasonable doubt that the Defendant killed the victim during an attempt to perpetrate a robbery. *See* T.C.A. § 39-13-202(a)(2) (2006). The mental state required for the conviction was that the Defendant possessed the intent to commit the underlying offense, which in this case was the attempt to commit robbery. Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id*. §§ 39-13-202(b) and 39-13-401(a).

The evidence, considered in the light most favorable to the State, proves that the assailants forcibly entered the victim's home through the carport garage door and demanded money from the victim. The Defendant was kneeling over the victim who was lying on the floor, wrapped in his bed comforter. When the victim repeatedly denied having any money, and the Defendant and "Big P" were unable to find any money in the victim's vehicle, the Defendant asked "Big P" for the gun and shot the victim three times. The Defendant and "Big P" then fled in the victim's vehicle, leaving the victim to die as a result of the shooting.

This evidence shows that, during the course of an attempted robbery, the Defendant shot and killed the victim. Accordingly, we conclude that the evidence is sufficient to support the jury's finding that the Defendant was guilty beyond a reasonable doubt of first degree murder in the perpetration of an attempted robbery. As such, the Defendant is not entitled to relief on this issue.

## 2. Attempted Aggravated Robbery

As relevant to this case, a conviction for attempted aggravated robbery consists of an attempt to commit the "intentional or knowing theft of property from the person of another by violence or putting the person in fear" and is "accomplished with a deadly weapon" or causes the victim "serious bodily injury." T.C.A. § 39-13-401 and 402 (2006).

The evidence, considered in the light most favorable to the State, proves that the Defendant entered the victim's home and demanded money from the victim. The Defendant then shot the victim three times.

Accordingly, we conclude that the evidence is sufficient to support the Defendant's conviction for attempted aggravated robbery beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE